UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

UNITED STATES OF AMERICA,           :

                *Plaintiff*           :

- v. -           11 Cr. 12 (RMB)

                                :

JOHN BRANCACCIO,

                              :

                *Defendant.*

                                :

------------------------------------------------------------------X

## EMERGENCY MOTION FOR SENTENCE REDUCTION
## PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)

Ellen B. Resnick
Law Offices of Alan S. Futerfas
565 Fifth Avenue, 7th Floor
New York, New York 10017
Tel.: (212) 684-8400
*Counsel for John Brancaccio*

## PRELIMINARY STATEMENT

John Brancaccio respectfully moves this Court under 18 U.S.C. § 3582(c)(1)(A)(i) to modify his sentence to time served and immediately release him to begin a three-year term of supervised release or, alternatively, home confinement with whatever conditions this Court deems appropriate.

The unprecedented threat of COVID-19 could not have been foreseen at sentencing and poses extraordinary risks to Mr. Brancaccio's health. Mr. Brancaccio, age 53, has a documented medical history of four chronic conditions -- hypertension, obesity, borderline diabetese, and high cholesterol – two of which place him at risk of suffering serious, if not fatal, complications were he to contract the virus. He is detained at FCI Gilmer in West Virginia, a facility that has seen a very recent spike in coronavirus infections among inmates. This recent outbreak of new infections is occurring just as the country is experiencing a second wave of the coronavirus. The risk of infection in a prison setting is already high, because adherence to social distancing and hygiene is profoundly difficult if not impossible, and testing for the virus is insufficient to prevent the spread. The risk to Mr. Brancaccio of contracting the virus has probably never been higher than it is now.

Mr. Brancaccio has completed more than 80% of his sentence of 165 months. Accounting for the good-time credit he already has earned, his projected release date is November 17, 2022. But he is eligible for transfer to a halfway-house six months before his scheduled release date in the ordinary course. That takes us to mid-June 2021, less than 9 months from now. (See sentencing monitoring computation data, Exhibit A.)

On or about early April 30, 2020, Mr. Brancaccio made a request to prison staff at FCI Glimer on compassiate release grounds based upon the risk of Covid infection and his underlying medical conditions. On or about May 12, 2020, Mr. Brancaccio was informed that his request

had been denied. He thereafter appealed his request for compassionate release to the warden. That request was received by the institution on June 12, 2020 and denied by the warden on June 24, 2020. (These records, demonstrating exhaustion of administrative remedies, is attached hereto as Exhibit B.) Mr. Brancaccio, therefore, now submits this emergency motion for relief.

## BACKGROUND

1. **Mr. Brancaccio's Conviction and Incarceration.**

On January 25, 2011, Mr. Brancaccio was charged in a multidefendant case alleging narcotics trafficking, extortion conspiracy and illegal gambling as part of racketeering activity allegedly committed on behalf of the Gambino organized crime family. On April 26, 2012, Mr. Brancaccio pled guilty pursuant to a global plea with five codefendants before this Court to a substantive RICO offense under Title 18 U.S.C. § 1962(c) and allocuted to conduct in support of the charged racketeering enterprise, including cocaine trafficking, marijuana trafficking, extortion conspiracy and operating an illegal gambling business. (See ECF 532, Mr. Brancaccio's sentencing submission, filed on July 9, 2012; ECF 541, the Government's sentencing submission, filed on July 13, 2012). On September 20, 2012, this Court sentenced Mr. Brancaccio to 165 months in prison, to be followed by three years of supervised release. (See ECF 618, J&C)

Mr. Brancaccio has been incarcerated since his arrest on January 20, 2011 and is currently serving his sentence at FCI Gilmer in West Virginia. His projected statutory release date is November 17, 2022, a little more than two years from now. Consequently, he has served approximately 82 percent of his sentence. (See Exhibit A) With transfer to a halfway house six months prior to his release date, Mr. Brancaccio is currently likely less than 9 months away from being released from prison.

2.  **Mr. Brancaccio's Medical Conditions and Current Conditions at FCI Gilmer**

Mr. Brancaccio is especially vulnerable to the threat of suffering severely if he contracts COVID-19 while incarcerated at FCI Gilmer. As indicated in his BOP medical records, Exhibit C,[1] he is 53 years old and has two underlying health conditions - hypertension and obesity - that increase his vulnerability to the worst consequences of COVID-19. Prisons in general pose unique risks to every incarcerated inmate of becoming infected with COVID-19. But those risks are particularly apparent at FCI Gilmer which has seen a recent outbreak of Covid cases.

On October 25, 2020, the Bureau of Prisons (BOP) website reported 21 inmates who had tested positive at FCI Gilmer, among 282 who had been tested. See Bureau of Prisons, COVID-19, https://www.bop.gov/coronavirus/accessed on October 25, 2020. On October 6, 2020, the BOP website reported 3 positive covid cases among 191 who had been tested. See Bureau of Prisons, COVID-19, https://www.bop.gov/ coronavirus/accessed on October 6, 2020. Less than two weeks before that, on September 21, 2020, the BOP website reported 11 positive covid cases among inmates; 172 inmates who had been tested. See Bureau of Prisons, COVID-19, https://www.bop.gov/coronavirus/accessed on September 21, 2020. Just days before that, the website reported reported 2 positive cases among 133 inmates who had been tested. See Bureau of Prisons, COVID-19, https://www.bop.gov/coronavirus/ accessed on September 1, 2020. Thus, the BOP's own data show a significant worsening trend and an inability of the facility to prevent or control the spread of the virus. Moreover, the cohort of inmates that has been tested is a small subset of the approximately 1200 inmates currently incarcerated at FCI Gilmer.

---

[1] Due to Mr. Brancaccio's privacy interests in his medical records, attached as Exhibit C, we respectfully request that they be filed separately under seal. Mr. Brancaccio consents to the public filing of all of his health information contained in this motion.

3

## ARGUMENT

## EXTRAORDINARY AND COMPELLING CIRCUMSTANCES SUPPORT MODIFYING MR. BRANCACCIO'S SENTENCE TO TIME SERVED OR, AT A MINIMUM, RELEASING HIM TO HOME CONFINEMENT.

### 1. The First Step Act

It is well established that "[a] court may not modify a term of imprisonment once it has been imposed except pursuant to statute." *United States v. Gotti*, 433 F.Supp. 3d 613 (S.D.N.Y. Jan. 15, 2020). However, "there are certain limited circumstances, including compassionate release." *See United States v. Roberts*, No. 18 Crim. 528 (JMF), 2020 WL 1700032, at *1 (S.D.N.Y. Apr. 8, 2020) (internal quotation marks and citation omitted). Pursuant to Section 3582(c)(1)(A)(i) OF Title 18, the First Step Act ("FSA"), courts are authorized to modify or reduce the terms of imprisonment "upon motion of the Director of the Bureau of Prisons or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). To grant relief, the court must find that "extraordinary and compelling reasons warrant such a reduction" and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).

The "applicable policy statements" referenced in the statute are found at Section 1B1.13 of the United States Sentencing Guidelines. These policy statements limit the types of circumstances that could be considered "extraordinary and compelling reasons." However, the Second Circuit recently ruled that when compassionate release motions under the First Step Act are brought by a defendant (not the BOP), district courts are not bound by Section 1B1.13 Application Note 1(D) ("Application Note 1(D)"), which makes the Bureau of Prisons the sole

4

arbiter of whether most reasons qualify as extraordinary and compelling. *United States v. Brooker*, 2020 WL 5739712, at *1 (2d Cir. September 25, 2020). Consequently, district courts may consider any circumstances in deciding whether to grant relief.

> [T]he First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion.

*Brooker, supra*, at *7. *See United States v. Harris*, No. 15-CR-0445, 2020 WL 5801051, at *2 (S.D.N.Y. Sept. 29, 2020) (considering the Section 3553(a) factors and recognizing that, under *Brooker*, "when assessing a motion brought directly by an imprisoned person rather than by the BOP, the Court is constrained neither by U.S.S.G. § 1B1.13's enumeration of extraordinary and compelling reasons, nor by its freestanding requirement that the defendant seeking release not pose any danger to the community").

The court must also consider the factors set forth in Section 3553(a) to the extent that they are applicable. 18 U.S.C. § 3582(c)(1)(A). In making a sentencing determination, the Court must arrive at a sentence that is "sufficient, but not greater than necessary, to comply with the purpose of [sentencing]." 18 U.S.C. § 3553(a). To do so, the Court is compelled to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) [the kinds of sentence and sentencing range provided for in the USSG] (5) any pertinent [Sentencing Commission policy statement] (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

*Id.*

Application of the Section 3553(a) factors requires an assessment of whether the relevant

factors "outweigh the 'extraordinary and compelling reasons' warranting compassionate release . . .[and] whether compassionate release would undermine the goals of the original sentence.'" *United States v. Daugerdas*, 2020 WL 2097653, at *4 (S.D.N.Y. May 1, 2020), *quoting United States v. Ebbers*, 432 F.Supp. 3d 421, 430-31 (S.D.N.Y. January 8, 2020). For purposes of granting compassionate release, courts should consider the adversity presented by the circumstances under which defendants must now serve their sentence. "The 'severity of [Defendant's] conduct remains unchanged. What has changed, however, is the environment where [he] is serving his sentence." *United States v. Pellegrino*, 2020 WL 5820325, at *4 (E.D.N.Y September 30, 2020), *quoting United States v. Zukerman,* 451 F.Supp. 3d 329, 336 (S.D.N.Y. August 3, 2020)("When the Court sentenced [Defendant], the Court did not intend for that sentence to 'include incurring a great and unforeseen risk of severe illness or death' brought on by a global pandemic")(quotion omitted).

The time remaining on a defendant's sentence is one of the considerations under Section 3553(a). "[T]he limited duration remaining on Defendant's sentence," serves "as an additional consideration favorable to granting [his] motion for compassionate release." *Pellegrino, supra, quoting United States v. Miller,* 2020 WL 3187348, at *5 (D. Conn. June 15, 2020).

2.    **The Circumstances Support a Finding that Compassionate Release is Warranted.**

It is respectfully submitted that Mr. Brancaccio has demonstrated circumstances that are extraordinary and compelling in light of the Covid pandemic to warrant granting his request for compassionate release. As a preliminary matter, Mr. Brancaccio has exhausted his administrative remedies, pursuant to 18 U.S.C. § 3582(c)(1)(A), by requesting compassionate release from the warden and receiving a denial. (See Exhibit C)

Mr. Brancaccio has underlying medical conditions that pose a significant risk of serious complications particularly where his facility, FCI Gilmer, has seen recent and recurring Covid

outbreaks. His criminal history, coupled with consistent and laudatory self-improvement efforts while incarcerated, demonstrate that he is not a danger to the community. He has a solid release plan for work, housing and reintegration in his supportive community of friends and family. Finally, that Mr. Brancaccio has served more than 82 percent of his sentence, and may be released to a halfway house within 9 months, supports a finding that general and specific deterrence would be satisfied were he granted compassionate release now.

### A. Mr. Brancaccio's Medical Conditions Render Him Particularly Vulnerable.

As indicated in his BOP medical records, Exhibit C, Mr. Brancaccio suffers from obesity, hypertension, high cholesterol and borderline diabetese. (Ex. C at 2-3) As of May 2020, he was being prescribed four medications. (Ex. C at 3) Hypertension has "been associated with increased illness severity and adverse outcomes" from COVID–19.[2] The World Health Organization has found that the mortality rate among those with hypertension is 8.4%, compared to 1.4% for those who are otherwise healthy.[3]

---

[2] CDC, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID–19), available at https://bit.ly/3cjQyRM. See also CDC COVID–19 Response Team, Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019—United States, February 12–March 28, 2020, at 383, CDC, Morbidity & Mortality Weekly Report (Apr. 3, 2020) ("Prevalence Report"), available at https://bit.ly/34A6RqI (concluding, "consistent with findings from China and Italy," that "patients with underlying health conditions and risk factors, including ... hypertension, ... might be at higher risk for severe disease or death from COVID–19"); Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease, Centers for Disease Control and Prevention, *available at* https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last updated April 13, 2020); World Health Org., Report of the WHO–China Joint Mission on Coronavirus Disease 2019 (COVID–19), at 12 (Feb. 24, 2020) ("WHO–China Report"), available at https://bit.ly/2ySm9eH ("Individuals at highest risk for severe disease and death include ... those with underlying conditions such as hypertension.").

[3] Id.; see also Wu et al., Characteristics and Important Lessons from the Coronavirus 2019 (COVID–19) Outbreak in China, J. Am. Med. Ass'n (Feb. 24, 2020) (finding mortality rate of 6.0% among those with hypertension, versus 2.3% overall), https://bit.ly/2VaesJN.

Mr. Brancaccio is also morbidly obese. He is 66 inches tall (5'6") and weighs 245 pounds. (Ex. C at 2) This correlates to a BMI (body mass index) of 34.9. The maximum healthy weight for Mr. Brancaccio's height is 100 pounds <u>less</u> than his current weight. (See Ex. C at 5: "Ideal max wt: 158 lbs"). A BMI of 34.9 places Mr. Brancaccio in the category of "morbidly obese." The CDC recognizes that a body mass index <u>greater than 30</u> constitutes morbid obesity and places individuals at greater risk of severe illness from COVID-19.[4]

A study of Covid–19 positive patients in New York City found that those under 60 years old with a BMI between 30 and 34 "were 2.0 and 1.8 times more likely to be admitted to acute and critical care, respectively, compared to individuals [with a BMI less than 30]. For patients in the same age group with a BMI over 35, the risk was 2.2 and 3.6 times higher, respectively."[5] Thus, "[o]besity appears to be a previously unrecognized risk factor for hospital admission and need for critical care," and "may contribute to increased morbidity rates."[6]

Regardless of his age, these comorbidities – hypertension and obesity -- place Mr. Brancaccio at heightened risk for deadly consequences should he contract COVID-19.[7]

---

[4] *See People of Any Age with Underlying Medical Conditions, Centers for Disease Control and Prevention* (accessed August 26, 2020)("CDC report"), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.; The Centers for Disease Control and Prevention (the "CDC") lists obesity—defined as having a BMI of 30 or higher—as a condition that places individuals at "increased risk of severe illness from COVID-19." Coronavirus Disease 2019 (COVID-19).

[5] Lighter et al., Obesity in Patients Young Than 60 Years Is a Risk Factor for COVID– 19 Hospital Admission, at 1, Clinical Infectious Diseases (forthcoming) (Apr. 9, 2020), *available at* https://bit.ly/3bg2dRy.

[6] *Id.* at 2. Two preprint publications reach similar conclusions. Petrilli et al., Factors Associated with Hospitalization and Critical Illness Among 4,103 Patients with COVID–19 disease in New York City, at 14 (Apr. 11, 2020) ("[T]he chronic condition with the strongest association with critical illness was obesity, with a substantially higher odds ratio than any cardiovascular or pulmonary disease."), https://bit.ly/2XzRTj1; Cai et al., Obesity and COVID–19: Severity in a Designated Hospital in Shenzhen, China (Apr. 1, 2020) ("[O]besity, especially in men, significantly increases the risk of developing severe pneumonia in COVID–19 patients."), https://bit.ly/2VapChG.

Third, although Mr. Brancaccio's age (53) does not place him in the highest risk category, it does elevate his risk. The CDC has found that the hospitalization rate for those aged 50–64 is 1.6 times the overall rate, and three times the rate for those aged 18–49.[8] That risk is increased significantly where the patient also suffers from obesity and hypertension. In Mr. Brancaccio's age cohort of 50–64 years old, obesity and hypertension were the two most prevalent comorbidities for patients hospitalized with COVID-19: obesity (observed in 49.0% of patients), hypertension (observed in 47.4% of patients).[9]

Numerous courts have determined that the comorbidities of hypertension and obesity— Mr. Brancaccio's underlying conditions – are alone, or in conjunction with other ailments, sufficient to find extraordinary and compelling circumstances during the pandemic to support granting compassionate release. *See e.g., United States v. Norman Lee*, 2020 WL 4053352 (D.MD July 20, 2020)( 34 year old inmate at FCI Gilmer, with four years remaining on sentence, suffering from hypertension, type 2 diabetes, and obesity); *United States v. Bethea-Williams*, 2020 WL 2848098, at *4 (S.D.N.Y. June 4, 2020)(hypertension and obesity); *United States v. Gross*, 2020 WL 1673244, at *1 (S.D.N.Y. Apr. 6, 2020) (hypertension and obesity, among other illnesses); *United States v. Sawicz*, 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020)(hypertension alone in 43-year-old defendant); *United States v. Zukerman*, 16 Cr. 194 (AT), 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020) (hypertension, diabetes, obesity); *United States v. Colvin*, 2020 WL

---

[7] See article: "Regardless of age, obesity and hypertension increase risks of COVID-19." Mitchell Katz, MD, September 20, 2020. https://jamanetwork.com/jurnals/fullarticle/2770541.

[8] Id., Hospitalization Rates Report, at 2, 3 fig.1 (7.4 hospitalizations per 100,000 for those aged 50–49, compared to 4.6 overall and 2.5 for those aged 18–49).

[9] Garg et al., Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019—COVID–NET, 14 States, March 1– 30, 2020, at 2, 5 tbl., CDC, Morbidity & Mortality Weekly Report (Apr. 8, 2020) ("Hospitalization Rates Report"), available at https://bit.ly/3bclL9d.

1613943 (D. Conn. Apr. 2, 2020) (hypertension, diabetes); *United States v. Rodriguez*, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020) (hypertension, diabetes, obesity); *United States v. Burrill*, 2020 WL 1846788 (N.D. Cal. Apr. 10, 2020) (multiple conditions, including hypertension); *United States v. Hansen*, 2020 WL 1703672 (E.D.N.Y. Apr. 8, 2020) ( (multiple conditions, including hypertension); *United States v. Resnick*, 2020 WL 1651508 (S.D.N.Y. Apr. 2, 2020) (multiple conditions, including hypertension); *United States v. Muniz*, 2020 WL 1540325 (S.D. Tex. March 30, 2020) (multiple conditions, including hypertension).

### B. Conditions at FCI Gilmer Make the Risk of Exposure to the Virus Serious and Unavoidable.

Federal prisons, in general, are at much greater risk of a coronavirus outbreak than society generally. "[N]otwithstanding BOP's efforts to control the spread of COVID-19 within its institutions, it "cannot seriously be disputed" that an individual is better able to control his risk of contracting COVID-19 outside of prison and that reducing the overall prison population is an important mitigation strategy for those who remain incarcerated." *United States v. Harrison*, 2020 WL 5702106, at *3 (D.D.C. September 24, 2020).

The conditions at FCI Gilmer, in particular, place Mr. Brancaccio at greater risk of contracting COVID-19, now and in the coming weeks and months, because inmates are unable to social distance at this facility. *See United States v. Watkins*, 2020 WL 4016097, at *2 (E.D.MI July 16, 2020)(granting release where defendant "has presented evidence that his medical conditions put him at greater risk of COVID-19 and that he is unable to social distance at Gilmer FCI.") An attorney for defendant Watkins submitted the following account of conditions at Gilmer FCI in support of his client's compassionate relief request:

> In speaking with other inmates at Gilmer, counsel has learned that it is impossible to take appropriate precautions there. Prisoners are let out in groups for recreational time. They line up to receive meals and cannot socially distance themselves. Phones and computers are shared and not cleaned between uses . Many prisoners do not wear masks. There is no separation in the showers; they

10

> are open rooms with three shower heads right next to each other… Prisoners get limited masks and must wash them themselves, with soap purchased at the commissary, or put them in the laundry that mixes with other inmates. Clothes are cleaned once per week. Staff are conducting "temperature" tests but not testing the majority of inmates.

(Supplemental Brief in Support of Martell Watkins' compassionate release application, dated July 10, 2020, Dkt. No. 15 Cr. 20333-AJT (E.D.MI) (ECF 79 at 4-5).

FCI Gilmer may also be vulnerable to reintroduction of the virus if and when inmates are transferred to the facility – as occurred in the outbreak there this past spring - or if there is a resurgence in the general public.

> The government's laudatory recounting of measures taken by the BOP to address the pandemic also is less impressive in light of incidents such as the Bureau's ill-advised decision to transfer already infected inmates to FCI Gilmer for quarantine, which resulted in an outbreak there, at a facility that previous had managed to hold the disease at bay. *See* Times West Virginian (May 3, 2020) ("Four days after out-of-state inmates were transferred to W.Va. for quarantine, the first coronavirus case was confirmed."), https://www.timeswv.com/COVID-19/four-days-after-out-of-state-inmates-were-transferred-to-w-va-for-quarantine-the/article_4d6d4ff6-8cdb-11ea-b700-b34865726b5b.html.

*United States v. Williams,* 2020 WL 4040706, at *4 (E.D.MI July 17, 2020); *see also United States v. Williams,* No. 15-20462, ECF No. 57, Page Id. 268 (E.D. Mich. July 13, 2020) (detailing the outbreak that occurred at FCI Gilmer because of the BOP's decision to quarantine coronavirus-positive inmates there).

The BOP's website, cited above, documents the recent uptick in positive coronavirus cases among inmates at FCI Gilmer and the limited number of tests that have been conducted. Wherever testing is lacking, even a low rate of positive test results does not necessarily indicate that there are few cases.

> Even at institutions where there are relatively few reported cases to date, that may be only due to the lack of widespread comprehensive testing, which means that there is the potential for an undetected breakout. *See, e.g., United States v. Brown,* No. 92-cr-0345, slip op. at 10 (D.D.C. July 2, 2020), ECF No. 93 ("wait and see strategy could prove too late to take preventative action"); *United States v. Dunlap,* No. 17-cr-207, 2020 WL 5231359, at *3 (D.D.C. Sept. 2, 2020) ("low

11

> number of reported cases might well be attributable to the fact that [BOP] has not implemented widespread testing for the virus" and thus "changes nothing about the inherent risks posed by carceral settings to vulnerable inmates"); *United States v. Croft*, No. 95-cr-496-1, 2020 WL 3871313, at *2 (E.D. Pa. July 9, 2020) (in the absence of a comprehensive testing protocol, "we cannot be certain of the true spread of infection at the prison"). At FCI Gilmer, for example, where Mr. Harrison is being detained, only 128 out of 1287 inmates have been tested. *See* https://www.bop.gov/coronavirus/ (viewed on Sept. 22, 2020).

*United States v. Harrison*, 2020 WL 5702106, at *3 (D.D.C. September 24, 2020).

On this record, it is clear that the coronavirus is present at FCI Gilmer and has not been contained or prevented. Further, the potential for Mr. Brancaccio to become exposed to the virus, and serious ill as a result, is both significant and unavoidable.

### 3. The 3553(a) Sentencing Factors Favor Releasing Mr. Brancaccio

Because Mr. Brancaccio has established extraordinary and compelling circumstances warranting his release, this Court is obligated to balance those circumstances against the Section 3553(a) factors to the extent they are applicable. 18 U.S.C. § 3582(c)(1)(A). Mr. Brancaccio's offense, we recognize, is serious. However, the sentencing factors support his release where he does not pose any risk of danger to the community, and the goals of rehabilitation and general and specific deterrence have been achieved.

#### A. Criminal Background

Brancaccio's criminal history includes state convictions for the sale of a controlled substance, and a state conviction for a 1993 assault with Intent to Cause Injury with a Weapon. (See Gov't Sentencing Memorandum, July 13, 2012, at 1-2, ECF 541) The 1993 assault case, while involving an act of violence, occurred more than 27 years ago. In the instant case, Brancaccio pled guilty in 2012 to, *inter alia*, participating in the affairs of a racketeering enterprise, trafficking 10 kilograms of cocaine (Racketeering Act 2) and 999 kilograms of marijuana (Raceteering Act 3), committing an extortion during which he and his co-conspirators threatened a victim with a gun (Racketeering Act 9) and running an illegal bookmaking

operation (Racketeering Act Five). The government was prepared to prove at trial that Mr. Brancaccio was a very significant cocaine trafficker and had engaged in the charged extortion by brandishing a firearm. (See Gov't Detention Memorandum, January 24, 2011, at 44-45).

### B. Rehabilitation

Even before he appeared for sentencing in 2012, Mr. Brancaccio had already demonstrated a strong and commendable desire to rid himself of his drug addiction, turn his life around and embrace a law-abiding and productive future. In 2012, shortly before his sentence date, Mr. Brancaccio asked this Court for an adjournment so he could complete a course at the MCC that had provided him with valuable tools for overcoming addiction and seeking self-improvement. He was preparing himself for the years of incarceration that lay ahead.

> I am writing you this letter in the hopes that you will be able to help me complete the Positive Lifestyles program by rescheduling my sentencing date for September of this year. I have been in this program since May of this year and have found that it is helping me in many ways. Your Honor as you can see by my record I have been involved with and battling drug addiction all my life. It has been the reason for my continuous downfalls and frankly I am tired of it. For the first time in my life I have found a program that I did not have to be in but wanted to be. I have already completed the 40 hour Drug Rehabilitation program and the Positive Lifestyles is the next phase. I have learned a lot through these programs here about my addictions. How my behavior and more importantly my attitude towards things has affected my life. Positive Lifestyles has proven to be a good resource to learning how I could address these behaviors and my attitude towards them by learning how to communicate more with others and doing self assessments of myself.
>
> I have grown as a person since being here and as a father to my son. Your Honor my son, John Jr. means more to me then everything in this world. It hurts me to know that all these years I have not only been destroying my life but hurting his as well. I am now learning to better communicate with him and how to be a positive force in his life even while I am incarcerated. I am not trying to take up any of your time. . . I am though trying to better myself as a person while being here so that this cycle can be broken and I can not only be a better person but a better father to my son. I am fully prepared to accept responsibility for my actions . . .

Letter of Mr. Brancaccio to the Court, dated July 5, 2012. (ECF 548)

The record shows that Mr. Brancaccio persevered along this commendable course. He continued to work diligently on his own self-improvement and rehabilitation in the years that followed. While incarcerated, he earned certificates in numerous courses, including the Drug Abuse Education Course he was pursing in 2012, and he completed an additional 200-plus hours of courses in areas such as critical reading and writing, public speaking, business, sanitation, real estate and parenting. (A transcript of coursework and certificates of completion are attached as part of Exhibit D, hereto.)

Mr. Brancacio works full time in food services at FCI Gilmer. He has an excellent record of conduct during his period of incarceration. (See disciplinary record, attached as part of Exhibit E.) And he continues to express remorse for the criminal behavior that resulted in his incarceration and his prolonged absence from his son and mother.

> I left a son who was only 9 years old when I was incarcerated. He is now a 19 year old young man and not a day goes by that I don't regret not being there to guide him as a father should. I need to be around for him and being 53 years old and at risk of COVID-19 leaves me unsure of that. During my sentence I have taken many classes and college courses in business as I'm planning to start my own when I'm released. Currently, I work in Food Service and culinary arts. I've taken every opportunity to improve myself and atone for the mistakes I've made. I've spent the last 9 years and 8 months changing the way I used to think and preparing to be a productive member of society. I just want to spend the rest of my life with my loved ones and I fear I won't get to in light of this deadly pandemic.

(Letter of John Brancaccio, attached as part of Exhibit F.)

C.  **Release Plan and Abundant Support**

Upon his release, Mr. Brancacio has been offered a place to live with his friends, Chris and Jeanette Bosshart, in their home on Long Island. He will have a job as well, working in the moving company that Chris Bosshart manages. Mr. Brancaccio has further plans, including taking college courses and starting a business some day. (See Release Plan, attached as part of Exhibit F.) One hurdle in his education while incarcerated has been his difficulty reading

because he has been unable to get prescription glasses. Addressing his poor eyesight, and managing his chronic health problems – hypertension and obesity – are also part of Mr. Branaccio's plan upon his release. (See id.)

Undersigned counsel has spoken with both Chris and Jeanette Bosshart. They are longstanding friends of Mr. Brancacco and could not be more supportive of his plan to return to the community and live a productive life. They are prepared to provide him with a place to live, a job, and the invaluable support of their friendship.

> I'm writing to you with great hope and optimism. I am a longtime friend of John Brancaccio. We are more like family then friends. We have vacationed together with our families and have celebrated many holidays together. My hope is we can celebrate a holiday together this year. As you know, John has spent a great deal of time behind bars. This time has been difficult for him but has enabled him to self-reflect and soul search. My conversations with John are very optimistic and engaging. He looks forward to spending time with his son that he has lost so much time with. John is also looking forward to getting back in the work force. I plan to hire John at the moving company I manage. The name of the moving company is Moveco Moving Company, located in Jamaica. Queens. John will be employed on a full-time basis. John will also be staying with my wife and I in our home. We are willing to help him as best we can. John has also suffered from recent medical issues and with the current times, we are hoping for an early release. I speak for myself, my wife, my daughter, his son, his mother, his sister, and his friends that we all look forward for John to come home.

(Letter of Chris Bosshart attached as part of Exhibit F.)

Mr. Brancaccio's son, John, has written a poignant letter of support, describing the life he hopes to build with his father to make up for too much lost time:

> I hope that you consider compassionate release for my father due to the current covid-19 outbreak. . . My father has missed the last 9 years of my childhood, the graduations, the birthdays, the times I felt like I needed him the most. I want to continue life with my father present and not locked away. . . Every time I speak to my father he says he's sorry for this and that he promises to make up for this lost time. My father is planning on owning a food truck and starting life with me as a son and pop truck. I don't care what we do as long as it's me and my father reunited standing side by side. I really can't wait to show my dad everything he missed. How to use an iphone. I can't wait for a complete family dinner. I can't wait to reverse the pause button and go back to a happy family. . .

(Letter of John Brancaccio, Jr., attached as part of Exhibit F.)

Mr. Brancaccio's mother, who has been unable to visit him for the past ten years, asks this Court to grant early release for her son:

> I am 76 years old. The past year has been hard for me. I need a hip replacement and I don't walk very good at all. I use a walker and I have heart problems. I haven't seen my son in years as I can't sit in a car for long. His only son only saw hin once in the 10 years since he has been locked up. I would appreciate your help.

(Letter of Ann Neubauer, attached as part of Exhibit F.)

## CONCLUSION

Mr. Brancaccio faces serious risks to his health as a result of his underlying medical conditions and the current coronavirus pandemic. He has served the vast majority of a long sentence that this Court imposed when no one could have foreseen how difficult the prison environment would become for all inmates in a pandemic, particularly a man in his 50's with underlying comorbidities. As the instant application occurs near the end of a long sentence, Mr. Brancaccio is very well positioned to lead a productive and law-abiding life if released. He has worked hard at rehabilitation and is extremely unlikely to ever reoffend. The nearly ten years he has served, coupled with conditions of supervised release, are sufficient to ensure general and specific deterrence.

For the reasons described above, the Court should immediately grant Mr. Brancaccio's motion for compassionate release and reduce his sentence time served, with three years of supervised release, or, alternatively, home confinement.

Dated:  New York, New York
        October 28, 2020

Respectfully submitted,

Ellen B. Resnick
Law Offices of Alan S. Futerfas
565 Fifth Avenue, 7th floor
New York, New York 10017
(212) 684-8400

16